UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| JOHNATHAN BRIGHT, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TEAM NISSAN, INC. )<br>)<br>Defendant. )<br>) | Civil Action No. 1:23-cv-179-AJ |

# AMENDED COMPLAINT AND JURY DEMAND

## PARTIES

1. The plaintiff, Jonathan Bright ("Mr. Bright" or "Plaintiff"), is a male resident of the State of New Hampshire residing in Manchester, New Hampshire with a mailing address of P.O. Box 6342, Manchester, NH 03108.

2. Defendant Team Nissan, Inc. ("Defendant" or the "Company") is a for profit business incorporated in the State of New Hampshire. The Defendant's principal office is located at 70 Keller Street, Manchester, NH 03103.

## JURISDICTION AND VENUE

3. This court has subject matter jurisdiction under 28 U.S.C. § 1331 because Mr. Bright has brought claims pursuant to the Americans with Disabilities Act ("ADA") 42 U.S.C. §§ 1201 et seq. The court may exercise supplemental jurisdiction over Mr. Bright's state law claims. 28 U.S.C. §1367.

4.     Venue is appropriate in the District of New Hampshire as the Defendant's acts and omissions giving rise to the claims in this Complaint occurred in the District of New Hampshire. Indeed, Mr. Bright worked for the Defendant and was fired by the Defendant within the District of New Hampshire.

5.     This court has jurisdiction over Defendant because the Defendant is a resident of New Hampshire as it is incorporated in New Hampshire and has its principal place of business in New Hampshire. Additionally, the Defendant purposefully availed itself of New Hampshire law by operating a corporation in New Hampshire, transacting business in New Hampshire, and employing employees (including, during the times relevant to this Complaint, Mr. Bright) in New Hampshire. Indeed, the Plaintiff was employed by the Defendant in the State of New Hampshire, was managed by the Defendant in the State of New Hampshire, and was terminated by the Defendant in the State of New Hampshire.

## STATEMENT OF FACTS

6.     Mr. Bright was hired by Team Nissan, Inc. in Manchester, New Hampshire as a technician in or around September 2017.

7.     At all relevant times, the Company employed 15 or more individuals in 20 or more calendar weeks in the prior 12 months.

8.     At all relevant times, the Company employed 50 or more employees within 75 miles of where Mr. Bright worked in Manchester, New Hampshire.

9.     At all relevant times, Mr. Bright was a qualified employee and performed his work satisfactorily.

10.    Mr. Bright suffers from Type 1 Diabetes which is sometimes referred to as juvenile diabetes since it is a condition he was born with.

11. Mr. Bright's Type 1 Diabetes is an impairment that substantially limits one or more of his major life activities, including but not limited to, his ability to engage in physical activities, his ability to take care for himself, and movement, as well as impairing major bodily functions including the functioning of his pancreas and his body's ability to regulate insulin, blood sugar, and energy levels.  As such, Mr. Bright is disabled under the Americans with Disability Act ("ADA") and under state law.

12. On his first day of work, Mr. Bright talked to human resources ("HR") manager Johanna St. Germain ("St. Germain") about his paperwork, including health insurance.  Mr. Bright disclosed to St. Germain that health insurance was very important to him because he suffered from Type 1 Diabetes.

13. St. Germain then informed Mr. Bright that his health insurance would start after his first 90 days of employment.

14. Mr. Bright then started working and succeeded in his work.

15. Indeed, at all relevant times Mr. Bright was a qualified individual who could (and did) perform the essential functions of his position with or without reasonable accommodations.

16. In the summer of 2018, Kevin Gilmore ("Gilmore"), a non-disabled man, was hired to take over the role of Service Manager.

17. Upon learning of Mr. Bright's disability, Gilmore immediately disliked Mr. Bright, and treated him differently from the other, non-disabled employees.

18. For example, when Mr. Bright's blood sugar ran dangerously low, Mr. Bright would sometimes get a soda during his break to get his sugar levels up.  Since it was Mr. Bright's break, he would sometimes stand in the breakroom drinking his soda.

19. Gilmore yelled at Mr. Bright every time Mr. Bright took a break and would imply that Mr. Bright was just "standing around drinking soda," even though most of the time, Mr. Bright was using his approved break that everyone got. Gilmore did not yell at non-disabled employees in this manner, even when they were drinking soda.

20. Mr. Bright explained to Gilmore that since he suffered from Type 1 Diabetes, when his blood sugar got low, Mr. Bright occasionally needed to get his sugar levels up, which is why he had to drink soda. Mr. Bright therefore requested the reasonable accommodation of being permitted to drink soda when and if his blood sugar levels were too low.

21. Gilmore was unhappy with this explanation and annoyed at Mr. Bright's request. He then told Mr. Bright that he had to clock out during his break time.

22. Notably, Mr. Bright was not taking any more time than non-disabled employees did on their breaks, and yet non-disabled employees were not required to clock out during their breaks. This reduced Mr. Bright's compensation.

23. Further, even if Mr. Bright had to get a soda when it was not his break time, it did not take any more than a few minutes to go to the vending machine, purchase the drink, and then finish it or drink it while he was working. Notably, non-disabled employees routinely went to the vending machines for a snack or drink throughout their shift, even when not on a break.

24. These non-disabled employees did not clock out whenever they went to the vending machines and they were not chastised for this.

25. Mr. Bright's request to be permitted to drink soda when his sugar levels were low constituted a reasonable accommodation request for his disability.

26. In or around the beginning of March 2019, Mr. Bright was involved in a car accident. During this accident, Mr. Bright almost died because his blood sugar was low. Fortunately, Mr. Bright was able to recover in an ambulance, however, diabetes impedes healing.

27. Due to the incident, Mr. Bright's body suffered lingering effects from the car accident and these effects exacerbated his diabetes symptoms. For example, it became much more difficult for Mr. Bright to predict and control his blood sugar levels, as the accident had such a severe impact on his body.

28. Indeed, after the car accident, it was much more difficult to regulate his blood sugar levels.

29. Mr. Bright therefore informed Gilmore about the car accident and how it had exacerbated his diabetes symptoms.

30. Mr. Bright told Gilmore that Mr. Bright would therefore have to watch his blood sugar more closely and might require the reasonable accommodation of being permitted to take breaks when he needed to get a soda or snack in order to get his blood sugar levels up.

31. Gilmore was very annoyed at Mr. Bright for talking about his diabetes and requesting further accommodations.

32. On or around March 20, 2019, Mr. Bright woke up with dangerously low blood sugar. Mr. Bright therefore called Gilmore to request the reasonable accommodation of being permitted to come into work a little late, as it would take a little time for him to raise his blood sugar to safe levels and it would be very dangerous for him to drive with his blood sugar this low.

33. Gilmore said that this was fine. As such, it appeared that this reasonable accommodation request was granted.

34. However, later that day, Gilmore presented Mr. Bright with a written warning, therefore revoking the previously granted reasonable accommodation.

35. Gilmore told Mr. Bright that he was being issued a write-up for being 20 minutes late to work.

36. Mr. Bright protested this write-up, reminding Gilmore that he had called him that morning to explain that his tardiness was disability-related, and that Gilmore had originally approved it.

37. Furthermore, non-disabled employees, such as Brian Miller ("Miller"), Javante, (last name unknown, "Javante"), Tim Heinz ("Heinz"), and Nick Ferraro ("Ferraro") were often not disciplined when they came in late.

38. Gilmore nonetheless informed Mr. Bright that he was written up, and that he couldn't be late again.

39. Gilmore told Mr. Bright that he needed to let Gilmore know when Mr. Bright was going to be late (which Mr. Bright did), but that he would not tolerate Mr. Bright being late even if it was disability related. Gilmore then threatened that if Mr. Bright was late anymore then he would find people to replace Mr. Bright.

40. Other than when Mr. Bright's diabetes disability flared up in the mornings, Mr. Bright was not late for work.

41. On March 26, 2019, Mr. Bright woke up with extremely low blood sugar levels again. It was very unsafe for him to drive to work until he was able to raise his blood sugar levels. Mr. Bright therefore called Gilmore and requested the reasonable accommodation of being permitted to come into work late, after he got his blood sugar under control.

42. Gilmore was very hostile towards Mr. Bright, even when Mr. Bright reminded him that this was disability–related (and as such constituted a disability-related reasonable accommodation request).

43. Later that day, Gilmore met with Mr. Bright and gave him another written warning for being late.

44. Mr. Bright again raised protected concerns that he felt like he was being targeted with these write-ups for being late. Indeed, Mr. Bright told Gilmore that there were many other non-disabled employees such as Javante, Miller, Ferraro, and Heinz who were regularly late.

45. Further, Javante even had several no–call, no-shows, and yet was never disciplined like Mr. Bright was.

46. Gilmore dismissed Mr. Bright's concerns by telling him to "worry about" himself. When Mr. Bright tried to explain how he felt discriminated against, Gilmore cut Mr. Bright off by saying that they could discuss this "like men," or Mr. Bright could go file a complaint with HR.

47. Mr. Bright then requested to speak to HR.

48. In or around the following week, Mr. Bright met with St. Germain in HR and raised protected concerns that he was being written up for being late even when he had notified Gilmore that his tardiness was disability related. Mr. Bright again requested the reasonable accommodation of being permitted to come in late when his blood sugar was too low to safely drive, since it was necessary for him to take the time to raise his blood sugar (which required ingesting food or drink and giving his body time to process it) before he commenced driving.

49. Even though this request was not an undue burden on the Company (as Mr. Bright could have stayed later to finish his work or called someone to cover for him for a few minutes),

St. Germain denied his reasonable accommodation request, telling Mr. Bright that he had to get to work on time for his shift every single day regardless of his disability. St. Germain further refused to engage in an interactive dialogue.

50. After this meeting, Mr. Bright raised protected concerns to his Shift Leader Timothy Heim ("Heim"), a non-disabled man. Heim noted that he has observed Gilmore targeting Mr. Bright, giving Mr. Bright extra tasks, seeming upset without justification whenever he talked to Mr. Bright, and writing Mr. Bright up for being late when many non-disabled employees also arrived late and were not punished. Heim therefore suggested that Mr. Bright speak to the Chief Financial Officer ("CFO") Frank Leone ("Leone"), a non-disabled man.

51. Mr. Bright therefore went to Leone's office and asked if he could meet with him.

52. Mr. Bright then raised protected concerns to Leone that he felt he was being discriminated against due to his diabetes disability. Indeed, Mr. Bright informed Leone that many non-disabled employees were regularly late to work such as Javante, Miller, Ferraro, and Heinz, who are all non-disabled employees.

53. Notably, these employees were regularly late to work, and Javante had recently missed about three days of work in one week with little to no notice of his absence. Despite this, Javante and other non-disabled employees were not disciplined whereas Mr. Bright had been disciplined twice and threatened with more discipline.

54. Leone told Mr. Bright that he should only "worry about" himself, so Mr. Bright explained that he was only requesting a reasonable accommodation for his diabetes disability because when it caused him to have low blood sugar in the morning, he might need some extra time to get his blood sugar up to safe levels before he could safely drive into work.

55. Indeed, Mr. Bright explained that his diabetes disability is a serious medical condition that requires constant monitoring and adjustments, and that Mr. Bright thought it was improper and discriminatory for him to be subjected to further adverse actions such as the write ups that Gilmore was giving him.

56. Leone said that he would look into it and ended the meeting.

57. That being said, Leone essentially refused to grant the reasonable accommodation requests and refused to engage in an interactive dialogue, even though Mr. Bright's accommodations would not have been an undue burden on the Company.

58. After Mr. Bright met with and raised protected concerns to Leone, Gilmore retaliated against Mr. Bright.

59. For example, Gilmore did not allow Mr. Bright to take breaks, and if Mr. Bright did have to take a break, Gilmore forced Mr. Bright to clock out while non-disabled employees were permitted to take a short break without having to clock out. Gilmore also gave Mr. Bright more assignments than non-disabled employees such as driving the shuttle vehicle, greeting guests, and filling out paperwork in addition to his regular tasks.

60. Even though Mr. Bright did not object to or have a problem changing roles throughout the day, the difference in activity levels made his blood sugar levels unpredictable. Indeed, the more active Mr. Bright is the higher his blood sugar spikes.

61. Mr. Bright therefore explained to Gilmore that he needed more breaks when he was doing more physical work, as it spiked his sugar levels, requiring him to sit down so that Mr. Bright wouldn't face serious health consequences.

62. Gilmore rolled his eyes at Mr. Bright and made it clear that he was extremely upset that he had mentioned his diabetes, and the need for further reasonable accommodations yet again.

63. It was clear to Mr. Bright's coworkers, as well, that Gilmore was targeting him and did not like him.

64. On or around May 23, 2019, Mr. Bright woke up and was experiencing low blood sugar as a result of a flare up of his diabetes disability.  Mr. Bright therefore called Gilmore right away and explained that his blood sugar was low, and that he would have to wait until his levels were up before he could safely drive in.

65. Gilmore curtly said "okay" and hung up.

66. Mr. Bright got his blood sugar under control, drove to work, and began working.

67. In the afternoon, Mr. Bright went to the payroll office to pick up his paycheck. Mr. Bright was then told that John Casey ("Casey") had taken his check from payroll.  This was odd because Mr. Bright did not ask him or approve for him to take his paycheck.  This seemed to be further harassment targeting Mr. Bright based on his disability (or because he had raised protected concerns).

68. Mr. Bright therefore immediately found Gilmore and expressed the concern that Casey had targeted him by taking his paycheck without his approval and leaving for the day without giving it to him.

69. Instead of addressing Mr. Bright's concern, Gilmore called him into his office and said he had allegedly warned Mr. Bright twice before that if he was late there would be further consequences.

70. Gilmore then said that Mr. Bright was being terminated for being late that morning.

71. Mr. Bright protested this and raised protected concerns that many other non-disabled employees were regularly late to work, and they were not similarly disciplined let alone terminated for being late even more often than him.

72. Gilmore nonetheless gave Mr. Bright termination paperwork.

73. As such, Mr. Bright was involuntarily terminated on or around May 23, 2019.

74. In September 2019, Mr. Bright timely filed a charge of discrimination with the New Hampshire Commission for Human Rights ("NHCHR").

75. After investigation, the NHCHR found probable cause on February 2, 2023.

76. Defendant subsequently removed this matter to this court.

## COUNT I

**(Disability Discrimination and Failure to Accommodate in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**

**Plaintiff v. Defendant**

77. The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

78. Mr. Bright's Type 1 Diabetes is an impairment that substantially limits one or more of his major life activities, including but not limited to, his ability to engage in physical activities, his ability to take care for himself, and movement, as well as impairing major bodily functions including the functioning of his pancreas and his body's ability to regulate insulin, blood sugar, and energy levels. As such, Mr. Bright is disabled under the Americans with Disability Act ("ADA").

79. At all relevant times, Defendant was an employer as defined by federal anti-discrimination laws, including the ADA, employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

80. At all relevant times, Mr. Bright was a qualified individual and was capable of performing the essential functions of his job with or without one or more reasonable accommodations.

81. Mr. Bright disclosed his disabilities to Defendant, Defendant was aware of Mr. Bright's disabilities, and/or Defendant regarded Mr. Bright as disabled.

82. Mr. Bright requested disability-related reasonable accommodations that would have assisted him in performing the essential functions of his job. These requested reasonable accommodations included, but were not limited to, coming in late when his blood sugar was low, disability-related time off, and taking breaks including to have a soda to bring up his blood sugar.

83. Defendant denied some or all of the reasonable accommodations requested by Mr. Bright, including his request to come in late when his blood sugar was low, his request for disability-related time off, and his request to take breaks including to have a soda to bring up his blood sugar.

84. Defendant and its agents failed to engage in an interactive dialogue related to some or all of Mr. Bright's reasonable accommodation requests.

85. Mr. Bright's requested disability-related accommodations did not pose an undue burden on Defendant.

86. Defendant, by and through their agents, discriminated against Mr. Bright due to his disabilities by subjecting Mr. Bright to adverse actions, including, but not limited to, by subjecting Mr. Bright to a harassing and otherwise hostile work environment, giving Mr. Bright

more strenuous work to perform, forcing Mr. Bright to clock out for short breaks (lowering his overall compensation), denying him legitimately requested disability related accommodations, and/or terminating Mr. Bright's employment.

87. Defendant acted with malice and/or with reckless indifference to the federally protected rights of Mr. Bright.

88. As a direct and proximate result of Defendant's violation of the ADA, Mr. Bright has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

89. The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT II

**(Disability Discrimination and Failure to Accommodate under RSA 354-A)**

**Plaintiff v. Defendant**

90. Plaintiff repeats and re-alleges all paragraphs above and below, as fully set forth in this Complaint.

91. Mr. Bright's Type 1 Diabetes is an impairment that substantially limits one or more of his major life activities, including but not limited to, his ability to engage in physical activities, his ability to take care for himself, and movement, as well as impairing major bodily

functions including the functioning of his pancreas and his body's ability to regulate insulin, blood sugar, and energy levels. As such, Mr. Bright is disabled under R.S.A. 354-A.

92. At all relevant times, Mr. Bright was a qualified individual with a disability and was capable of performing the essential functions of his job with or without one or more reasonable accommodations.

93. Bright disclosed his disabilities to Defendant, Defendant was aware of Mr. Bright's disabilities, and/or Defendant regarded Mr. Bright as disabled.

94. Mr. Bright requested disability-related reasonable accommodations that would have assisted him in performing the essential functions of his job. These requested reasonable accommodations included, but were not limited to, coming in late when his blood sugar was low, disability-related time off, and taking breaks including to have a soda to bring up his blood sugar.

95. Defendant denied some or all of the reasonable accommodations requested by Mr. Bright, including his request to come in late when his blood sugar was low, his request for disability-related time off, and his request to take breaks including to have a soda to bring up his blood sugar.

96. Defendant and its agents failed to engage in an interactive dialogue related to some or all of Mr. Bright's reasonable accommodation requests.

97. Mr. Bright's requested disability-related accommodations did not pose an undue burden on Defendant.

98. Defendant, by and through their agents, discriminated against Mr. Bright due to his disabilities by subjecting Mr. Bright to adverse actions, including, but not limited to, by subjecting Mr. Bright to a harassing and otherwise hostile work environment, giving Mr. Bright more strenuous work to perform, forcing Mr. Bright to clock out for short breaks (lowering his

overall compensation), denying him legitimately requested disability related accommodations, and/or terminating Mr. Bright's employment.

99. Defendant acted with willful and/or reckless disregard to the state protected rights of Mr. Bright.

100. As a direct and proximate result of Defendant's violation of the RSA 354-A, Mr. Bright has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

101. Mr. Bright seeks all damages to which he is entitled, including, but not limited to compensatory damages (including, but not limited to, emotional distress damages and lost compensation and benefits, including back pay, front pay, and reduced earning capacity), enhanced compensatory damages, interest, attorney's fees, and costs.

## COUNT III

**(Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**
**Plaintiff v. Defendant**

102. The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

103. Mr. Bright engaged in protected activity under the ADA, including, but not limited to, (i) by requesting and/or utilizing disability-related accommodations; (ii) by raising protected concerns related to disability-related harassment and discrimination; and/or (iii) by raising protected concerns related to the improper failure of Defendant to grant disability-related accommodations and to engage in an interactive dialogue about requested disability-related accommodations, as well as potential alternative accommodations.

104. Defendant discriminated against and/or retaliated against Mr. Bright for engaging in activities protected under the ADA, including but not limited to, by subjecting Mr. Bright to adverse actions, including, but not limited to, by subjecting Mr. Bright to a harassing and otherwise hostile work environment, giving Mr. Bright more strenuous work to perform, forcing Mr. Bright to clock out for short breaks (lowering his overall compensation), denying him legitimately requested disability related accommodations, and/or terminating Mr. Bright's employment.

105. Defendant unlawfully coerced, intimidated, threatened, and/or interfered with Mr. Bright's exercising of, or enjoyment of, one or more rights granted by the ADA.

106. Defendant acted with malice and/or with reckless indifference to the federally protected rights of Mr. Bright.

107. As a direct and proximate result of Defendant's violation of the ADA, Mr. Bright has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

108. The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## COUNT IV

## (Retaliation for Engaging in Protected Activity in Violation of RSA 354-A)

## Plaintiff v. Defendant

109. Plaintiff repeats and re-alleges all paragraphs above and below, as fully set forth in this Complaint.

110. Mr. Bright engaged in protected activity under RSA 354-A, including, but not limited to, (i) by requesting and/or utilizing disability-related accommodations; (ii) by raising protected concerns related to disability-related harassment and discrimination; and/or (iii) by raising protected concerns related to the improper failure of Defendant to grant disability-related accommodations and to engage in an interactive dialogue about requested disability-related accommodations, as well as potential alternative accommodations.

111. Defendant discriminated against and/or retaliated against Mr. Bright for engaging in activities protected under RSA 354-A, including but not limited to, by subjecting Mr. Bright to adverse actions, including, but not limited to, by subjecting Mr. Bright to a harassing and otherwise hostile work environment, giving Mr. Bright more strenuous work to perform, forcing Mr. Bright to clock out for short breaks (lowering his overall compensation), denying him legitimately requested disability related accommodations, and/or terminating Mr. Bright's employment.

112. Defendant unlawfully coerced, intimidated, threatened, and/or interfered with Mr. Bright's exercising of, or enjoyment of, one or more rights granted by RSA 354-A.

113. Defendant acted with willful and/or reckless disregard to the state protected rights of Mr. Bright.

114.    As a direct and proximate result of Defendant's violation of the RSA 354-A, Mr. Bright has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

115.    Mr. Bright seeks all damages to which he is entitled, including, but not limited to compensatory damages (including, but not limited to, emotional distress damages and lost compensation and benefits, including back pay, front pay, and reduced earning capacity), enhanced compensatory damages, interest, attorney's fees, and costs.

WHEREFORE, the plaintiff, Jonathan Bright, respectfully prays that this honorable court:

A. Schedule this matter for trial by jury;

B. Find the Defendant liable on all counts;

C. Award the Plaintiff his lost compensation and benefits (including, but not limited to, back pay and front pay);

D. Award the Plaintiff other monetary damages, including damages for his diminished earning capacity and injury to reputation;

E. Award the Plaintiff damages for his emotional pain, mental anguish, loss of enjoyment of life, suffering, and other emotional distress damages;

F. Award the Plaintiff compensatory damages, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

G. Award the Plaintiff enhanced compensatory damages;

H. Award the Plaintiff punitive damages;

    I. Award the Plaintiff his reasonable attorney's fees;

    J. Award the Plaintiff interest and costs;

    K. Award the Plaintiff all other damages to which he is entitled; and

    L. Grant such further relief as is just and equitable.

                                      Respectfully Submitted,
                                      JONATHAN BRIGHT

                                      By his attorneys,

                                      THE LAW OFFICES OF WYATT &
                                      ASSOCIATES P.L.L.C.

Date: April 26, 2023                  By: _/s/Timothy J. Brock_____

                                      Benjamin J. Wyatt, NH BAR # 20530
                                      BWyatt@Wyattlegalservices.com

                                      Timothy J. Brock NH BAR #268403
                                      TBrock@Wyattlegalservices.com

                                      The Law Offices of Wyatt & Associates,
                                      P.L.L.C.
                                      17 Elm Street, Suite C211
                                      Keene, NH 03431
                                      Telephone: (603) 357-1111
                                      Facsimile: (603) 685-2868

## Certificate of Service

I, Timothy Brock, hereby certify that I have caused the foregoing document to be served on Counsel for Defendant on this 26th Day of April 2023, via Electronic Mail.

Date: 4/26/2023_____                        /s/Timothy Brock_____
                                                             Timothy Brock